UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

ELEANOR PEDRONAN,

Plaintiff,

v.

NANCY A. BERRYHILL,

Defendant.

Case No. 18-cv-02241-LB

**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Re: ECF Nos. 18, 19

## INTRODUCTION

The plaintiff, Eleanor Pedronan, seeks judicial review of a final decision by the Commissioner of the Social Security Administration denying her claim for disability benefits under Title II of the Social Security Act.[1] The plaintiff moved for summary judgment.[2] The Commissioner opposed the motion and filed a cross-motion for summary judgment.[3] Under Civil Local Rule 16-5, the matter is submitted for decision by this court without oral argument. Both parties consented to

---

[1] Compl. – ECF No. 1 at 1. Citations refer to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF–generated page numbers at the top of the documents.

[2] Mot. – ECF No. 18.

[3] Cross–Mot. – ECF No. 19.

magistrate-judge jurisdiction.[4] The court grants the plaintiff's motion for summary judgment, denies the Commissioner's cross-motion, and remands for further proceedings.

## STATEMENT

### 1. Procedural History

On October 7, 2014, the plaintiff filed a claim for social-security-disability insurance ("SSDI") benefits under Title II of the Social Security Act ("SSA").[5] She alleged a lower-back injury and adjustment disorder with an onset date of April 2, 2014.[6] The Commissioner denied her SSDI claim initially and on reconsideration.[7] The plaintiff requested a hearing.[8]

Administrative Law Judge Brenton L. Rogozen (the "ALJ") held a hearing on November 21, 2016.[9] The plaintiff was represented by an attorney.[10] The ALJ heard testimony from the plaintiff and from the vocational expert ("VE") Robin Scher.[11] On January 18, 2017, the ALJ issued an unfavorable decision.[12] The plaintiff appealed the decision to the Appeals Council on March 31, 2017.[13] The Appeals Council denied her request for review on February 21, 2018.[14] On April 13, 2018, the plaintiff filed this action for judicial review and moved for summary judgment on October 31, 2018.[15] The Commissioner opposed the motion and filed a cross-motion for summary

---

[4] Consent Forms – ECF Nos. 8, 9, 10.

[5] AR 158–59. Administrative Record ("AR") citations refer to the page numbers in the bottom right hand corner of the Administrative Record.

[6] AR 170, 232.

[7] AR 60–72 (initial determination); AR 74–87 (reconsideration).

[8] AR 108–09.

[9] AR 35–59.

[10] AR 35.

[11] AR 36–59.

[12] AR 15–34.

[13] AR 7–11.

[14] AR 1–6.

[15] Compl. – ECF No. 1; Mot. – ECF No. 18.

judgment on November 27, 2018.[16]

## 2. Medical Records

### 2.1 John D. Warbritton, III, M.D. — Examining

On April 7, 2004, Dr. Warbritton, an orthopedic surgeon, conducted a medical examination of the plaintiff regarding a permanent-disability rating.[17] Dr. Warbritton found that the plaintiff's condition was permanent and that she could not perform heavy-lifting activities and repetitive-bending activities.[18] She was "unable to perform her full range of usual and customary job duties as a floor nurse."[19] An MRI study of her lumbar spine revealed a small right-sided disc herniation at L4-5 with degenerative disease involving the facet joints at the lower-lumbar levels.[20] Dr. Warbritton recommended limited supportive medical care and independent strengthening and stretching exercises.[21] He found that the use of "anti-inflammatory agents, muscle relaxants and narcotic analgesics" was reasonable and appropriate.[22] He said that the plaintiff should "undergo further spinal injections, such as epidural injections or facet blocks" but did "not recommend any sort of spine surgery."[23]

### 2.2 Allen Kaisler-Meza, M.D. and Vijayasree Kumar, PA-C — Treating

Dr. Kaisler-Meza was the plaintiff's treating physician from December 2008 to March 2015 and wrote the plaintiff's Medical Source Statement.[24]

On December 18, 2008, Dr. Kaisler-Meza reported that the plaintiff's injury caused "sharp aching pain" in her lower back and both legs.[25] He diagnosed the plaintiff with lumbar

---

[16] Cross–Mot. – ECF No. 19.

[17] AR 237–52.

[18] AR 238.

[19] AR 239.

[20] AR 241.

[21] AR 250.

[22] *Id.*

[23] *Id.*

[24] AR 592–94.

[25] AR 779.

radiculopathy, low-back pain, and lumbago.[26] The "straight leg raising test [was] positive on the right side in the supine position."[27]

On February 19, 2009, Dr. Kaisler-Meza viewed MRI film, which showed "several disc bulges but not nerve impingement" in the plaintiff's back.[28] He noted that the plaintiff continued to work full duty despite having pain.[29] On January 27, 2010, Dr. Kaisler-Meza's diagnosis of the plaintiff remained the same, but he noted that she was on "permanent and stationary" work status.[30]

On June 17, 2010, Dr Kaisler-Meza noted that "not much changed since her last visit," and she still had an aggravated back.[31] Dr. Kaisler-Meza conducted a Trigger Point Injection ("TPI") "into superficial musculature" in her "right quadratus lumborum."[32] He administered another TPI on the plaintiff on October 13, 2010.[33] As reported in a follow-up meeting on November 23, 2010, the injections caused only "temporary relief."[34] On March 30, 2011, Dr. Kaisler-Meza administered a TPI into the plaintiff's right buttock, where "she has had the most success with a TPI."[35] The plaintiff reported pain levels of "8–9/10" in her lower back.[36]

On December 28, 2012, the plaintiff was "unable to go back to work" due to "low back pain."[37] Dr. Kaisler-Meza noted that the plaintiff had "completed aquatic therapy," and "it helped her for pain relief."[38]

---

[26] Id.

[27] Id.

[28] AR 775.

[29] Id.

[30] AR 773–74.

[31] AR 771.

[32] AR 772.

[33] AR 768.

[34] AR 750–51.

[35] AR 737.

[36] AR 736.

[37] AR 676.

[38] Id.

On April 26, 2013, the plaintiff came in again for a "severe pain flare up with stiffness in the lower back" and was "tearful."[39] A majority of the time was spent counseling and coordinating the plaintiff's care.[40] The plaintiff was put "off from work" for three days.[41]

On April 9, 2014, Dr. Kaisler-Meza diagnosed the plaintiff with lumbar-disc displacement without myelopathy, lumbago, and backache not otherwise specified.[42] The plaintiff "appear[ed] to be anxious and in mild pain" regarding her lower-back.[43] The plaintiff's range of motion was "restricted with flexion [and was] limited to [two] degrees due to pain."[44] He noted that "a twitch response was obtained along with radiating pain on palpation" on both sides of the plaintiff's lumbar spine.[45] Additionally, she had "spinous process tenderness" on L3, L4 and L5.[46] Dr. Kaisler-Meza noted the plaintiff's pain level was at "8–9/10" and she was taking 50mg Tramadol tabs four times per day and over-the-counter Tylenol two times per day.[47] The plaintiff could not "walk on [her] heel[s]" and could not "walk on [her] toes."[48] Her straight-leg raising test was now negative, suggesting that pain did not radiate below the knee.[49] He noted that the plaintiff could work with permanent restrictions on carrying, lifting, pushing or pulling anything exceeding ten pounds, squatting, and bending.[50] The plaintiff was working eight to ten hours per week in home

---

[39] AR 752–53.

[40] AR 752.

[41] AR 753. Between April and October 2014, Physician Assistant Vijayasree Kumar performed some of the plaintiff's examinations supervised by Dr. Kaisler-Meza. PA Kumar conducted over thirty examinations of the plaintiff under the supervision of Dr. Kaisler-Meza.

[42] AR 494–98.

[43] AR 495.

[44] *Id.*

[45] *Id.*

[46] *Id.*

[47] AR 494.

[48] *Id.*

[49] *Id.*

[50] AR 487, 494, 497.

health.[51] Dr. Kaisler-Meza discussed treatment plans with the plaintiff, including an anti-inflammatory diet, a Prednisone taper for six days, and an H-wave-machine trial.[52] The H-wave machine would potentially "stabilize/immobilize the joint," as part of the plaintiff's rehabilitation plan.[53] She was "unable to tolerate topical capsaicin, Lidoderm patches, oral medication, and [was] in chronic pain and inflammation."[54] Dr. Kaisler-Meza noted that the "prednisone taper helped with the control of severe pain flare up."[55]

On May 1, 2014, the plaintiff's pain was at eight out of 10.[56]

On May 19, 2014, Dr. Kaisler-Meza observed the following pain behaviors: "facial grimacing, frequent shifting of posture or position and holding or supporting affected body part or area."[57] The plaintiff reported the pain at a nine out of ten.[58] The plaintiff had TPIs into her superficial musculature (right-quadratus lumborum) — injecting 1 ml of 1% lidocaine and 0.5% Marcaine.[59] The plaintiff reported that the procedure had a moderate effect on post-injection pain, which she ranked four to six out of ten.[60]

On June 12, 2014, Dr. Kaisler-Meza reported that the plaintiff was "unable to work due to her pain."[61] The plaintiff had completed her second of six authorized acupuncture sessions.[62] This time the plaintiff's pain was a "9–10/10" and she had "severe muscle spasm[s] over the mid back

---

[51] AR 485.

[52] AR 496.

[53] AR 491, 496.

[54] AR 491.

[55] AR 470, 490.

[56] AR 490.

[57] AR 486.

[58] AR 485.

[59] AR 486.

[60] *Id.*

[61] AR 481.

[62] *Id.*

radiating down the right lower back and [into the] groin as well as [the] right leg."[63] Dr. Kaisler-Meza concluded that the plaintiff was "unable to continue to work due to severe muscle spasms."[64]

On July 11, 2014, Dr. Kaisler-Meza noted that the patient's pain was an eight out of 10.[65] On August 20, 2014, Dr. Kaisler-Meza noted that the plaintiff's pain was six out of 10 and that the H-Wave machine was helpful.[66]

On October 10, 2014, Dr. Kaisler-Meza reported that the plaintiff was still taking 50mg tabs of tramadol and 500mg tabs of Tylenol if the pain was severe.[67] Her pain was a "6/10" but could get up to an "8–9/10" when it flared up.[68] Dr. Kaisler-Meza noted that she was unable to continue to work due to the severity of her muscle spasms.[69]

### 2.3 Park Acupuncture — Treating

Starting on November 4, 2009, the plaintiff met with Jae Park, a Doctor of Acupuncture and Oriental Medicine, at Park Acupuncture for "electrical acupuncture sessions."[70] The plaintiff "complained of constant back pain of 2 [to] 3 on a scale of 1 to 10" and indicated that the pain "level reache[d] up to 9-10 . . . if aggravated."[71] The plaintiff "reported more relaxed back muscles, decreased pain and improved range of motion after the treatment."[72] She did "not see much improvement in the activities of daily living such as bending, squatting, and lifting."[73]

---

[63] *Id.*

[64] AR 483.

[65] AR 477.

[66] AR 473.

[67] AR 470.

[68] *Id.*

[69] AR 471.

[70] AR 255.

[71] *Id.*

[72] *Id.*

[73] AR 254.

### 2.4 Ray Hsieh, M.D. — Treating

On June 23, 2011, the plaintiff met with Dr. Hsieh at Pain Care of Silicon Valley.[74] Dr. Hsieh performed epidural steroid injections ("ESI") on her spine at the L4-5 discs.[75] Dr. Hsieh noted that the "injection [was] appropriate to attempt to address the patient's lumbar radicular symptomatology by decreasing inflammation surrounding the discogenic pain generator process."[76]

On September 28, 2011, and February 8, 2012, Dr. Hsieh performed two ESI procedures at the L4 and L5 levels of the plaintiff's spine. On February 8, 2012, he performed an epidurogram for her lumbar-discogenic pain.[77]

### 2.5 Mark Culton, M.D. — Treating

On February 10, 2009, Dr. Culton, a radiologist referred by Dr. Kaisler-Meza, performed an MRI on the plaintiff's spine.[78] He noted that the "remaining disc levels appear[ed] unremarkable with no significant changes of degenerative disc disease and no significant stenosis observed."[79] He noted that "at L4-5, there is mild posterior annular disc bulging/diffuse."[80]

### 2.6 Ronald Lamberton, M.D. — Treating

On January 17, 2013, Dr. Lamberton, an occupational medicine specialist, performed a utilization review on behalf of Kaiser Permanente for authorization of aquatic and massage therapy for the lower back.[81] Dr. Lamberton denied authorization for additional aquatic therapy because it was recommended for "extremely obese" patients who suffered from "degenerative disc

---

[74] AR 274.

[75] AR 276.

[76] AR 277.

[77] AR 280–83, 288–90.

[78] AR 261–64.

[79] AR 264.

[80] AR 262.

[81] AR 307–12.

United States District Court
Northern District of California

disease."[82] He denied authorization for massage therapy because it was recommended for patients actively "participating in graded aerobic and graded strengthening programs," which the plaintiff was not doing.[83]

### 2.7    Omega Sports Rehabilitation, Inc. — Treating

On September 25, 2012, the plaintiff visited Omega Sports Rehabilitation, Inc. for aquatic therapy sessions.[84] Ms. Marianne Arild, a physical therapist, noted that the plaintiff "tolerated [treatment] but fatigues quickly."[85] The emphasis during aquatic therapy was on "lumbar stabilization and strengthening."[86] On October 10, 2012, the plaintiff completed another session of aquatic therapy.[87] Iqbaal Maan, DPT, MPT, noted that she presented with "muscle tightness and poor postural alignment."[88]

### 2.8    Janine Marinos, Ph.D. — Examining

On December 11, 2014, Dr. Marinos performed a complete psychological evaluation on the plaintiff.[89] The plaintiff was "able to bathe and dress herself independently and do light cleaning, shopping, and simple meal preparation."[90] Dr. Marinos diagnosed the plaintiff with adjustment disorder with depressed mood.[91] The "subtest scores on the WAIS-IV [Wechsler's Adult Intelligence Scale] ranged from average to moderately impaired, with the lowest score likely due to concentration problems."[92] Dr. Marinos noted that the plaintiff's "major obstacle to adequate

---

[82] AR 309.

[83] *Id.*

[84] AR 303.

[85] AR 298.

[86] AR 299.

[87] AR 305.

[88] *Id.*

[89] AR 597–99.

[90] AR 598.

[91] AR 599.

[92] *Id.*

job performance would appear to be [her] physical condition."[93] She was able to "understand, remember, and carry out simple instructions, interact appropriately with others, and deal with changes in a routine work setting."[94] Dr. Marinos assigned the plaintiff a Global Assessment of Functioning ("GAF") score of 60, indicating moderate symptoms.[95]

### 2.9   Lara A. Salamancha, M.D. — Examining

On February 26, 2016, Dr. Salamacha conducted an orthopedic evaluation on the plaintiff.[96] The plaintiff had a "normal reciprocal gait" and no "focal tenderness to palpation in the midline or paraspinous regions."[97] There were no signs of abnormal muscle spasms, and facet signs of pain were positive on the right and negative on the left.[98] Dr. Salamacha noted right L5 radiculitis with pain distribution and a sensory pattern of numbness and tingling.[99] Dr. Salamacha assessed the plaintiff's functional capabilities and found that she could stand and walk for a maximum of six hours in an eight-hour time period and had no restrictions on sitting with routine position changes every thirty minutes.[100] The plaintiff could lift ten pounds frequently and twenty pounds occasionally due to her degenerative-disc disease.[101] Dr. Salamacha assessed no limitations on reaching, handling, feeling, fingering, or grasping with bilateral-upper extremities, and there were

---

[93] *Id.*

[94] *Id.*

[95] *Id.* "According to the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition ("DSM–IV"), a GAF of 51–60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co–workers). *See* Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. text rev. 2000). GAF scores of 61 to 70 indicate some mild symptoms or some difficulty in social, occupational, or school functioning, but the patient is generally functioning pretty well. *Id.*" *Turner v. Commissioner of Social Security,* No. 14–cv–04525–MEJ, 2015 WL 3546057, at n.1 (N.D. Cal. Jun. 5, 2015).

[96] AR 888–890.

[97] AR 889.

[98] *Id.*

[99] AR 890.

[100] *Id.*

[101] *Id.*

no visual, communicative, or work-place environmental limitations.[102]

## 2.10 Disability Determination Explanations — Non-Examining

Two disability determination explanations ("DDE") were issued during the pendency of the plaintiff's claim — one related to her initial claim for disability and a second related to her claim at the reconsideration level.[103] These reports included the physical and mental assessments of three state-agency consultants, who reviewed the plaintiff's medical records.

In the first DDE, issued on December 12, 2014, Ernest Wong, M.D., determined that the plaintiff was not disabled.[104] Dr. Wong, based on his review of the plaintiff's record, indicated that the plaintiff was a skilled worker who was capable of sustaining light work.[105] The plaintiff's prior "nursing skills [were] transferable to a light RFC."[106] Dr. Wong did not believe the objective medical evidence alone substantiated the plaintiff's statements about the intensity, persistence, and functionally limiting effects of the symptoms.[107] R.E. Brooks, M.D., noted that the plaintiff's limitations relate to physical elements, and not her ability to concentrate.[108] Thus, Dr. Brooks determined that the plaintiff's affective disorder did not meet the B or C criteria of the listings.[109]

---

[102] *Id.*

[103] AR 60, 74.

[104] AR 72.

[105] AR 71.

[106] *Id.*

[107] AR 68.

[108] AR 67.

[109] *Id.* The listings are individual criteria for different disorders as established in 20 CFR Pt. 404, Subpt. P, App. 1. Specifically, Drs. Wong and Brooks determined that the plaintiff's anxiety-related disorders did not meet the criteria in § 12.04 of the listings dealing with "Depressive, bipolar and related disorders." The B criteria of § 12.04 require "Extreme limitation of one, or marked limitation of two, of the following: (1) Understand, remember, or apply information[;] (2) Interact with others[;] (3) Concentrate, persist, or maintain pace[; and] (4) Adapt or manage oneself." The C criteria of § 12.04 require that a claimant's "mental disorder in this listing category is 'serious and persistent;' that is, you have a medically documented history of the existence of the disorder over a period of at least 2 years, and there is evidence of both: (1) Medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of your mental disorder; and (2) Marginal adjustment, that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life." (internal citations omitted)

In the second DDE on reconsideration, issued on June 11, 2015, W. Jackson, M.D. and A. Garcia, M.D., confirmed the initial finding that the plaintiff was not disabled.[110] Dr. Jackson stated that the "CE examiner's opinion is an overestimate of the severity of the individual's restrictions/limitations and based only on a snapshot of the individual's functioning."[111] They also confirmed Dr. Brooks's conclusion that the plaintiff's affective disorder did not meet the B or C criteria of the listings.[112]

### 3.  Administrative Proceedings

#### 3.1    Social Security Field Office Disability Report

On February 17, 2015, an SSA employee interviewed the plaintiff and made a disability report.[113] In the report, the plaintiff indicated that there was a "considerable increase of [her] low back pain, right leg, and right groin."[114] Her concentration was significantly diminished, and she was unable to sit, stand, or walk for longer than 30 minutes without pain in her right leg, buttock, and groin.[115] She stated that "lifting, bending, or squatting makes the pain more severe" so she used a "roller to carry groceries."[116]

#### 3.2    Plaintiff's Testimony

On November 21, 2016, the plaintiff testified at a hearing before the ALJ.[117] The ALJ asked the plaintiff whether she had worked at all since the alleged onset date.[118] She worked part-time as a visiting nurse for two to four hours a week at people's houses.[119] Her last job was in March

---

[110] AR 87.

[111] AR 85.

[112] AR 83.

[113] AR 195–96.

[114] AR 190.

[115] *Id.*

[116] AR 193.

[117] AR 35–59.

[118] AR 38–39.

[119] AR 39.

2016.[120]

The plaintiff's attorney examined her.[121] She asked the plaintiff why she stopped working at the hospital.[122] The plaintiff responded that "it got to the point that [she couldn't] do the lifting and the walking a lot, and sitting, and lifting, tugging, and the positioning patients is what became too taxing on [her] back."[123] She tried to find another job to support herself and worked part-time as a visiting nurse.[124]

The plaintiff had "lumbar pain constantly" that traveled to her right leg.[125] She classified her pain as a "ten" without medication, and an "eight" with medication.[126] She could stand for "maybe about five to 10 to 15 minutes" before having to sit down.[127] After standing for 15 minutes she got "super pain in [her] lowed back . . . [that went] down to [her] right buttocks to [her] groin and to [her] right leg."[128] Standing and walking were "about the same."[129] If she stood for a long time she had to sit, and if she sat for a long time then she had to stand up and walk a few steps.[130] She could sit for 10 to 15 minutes before needing to shift her position to "relieve the pain."[131] She could safely lift and carry "less than ten pounds;" any more gave her "severe lower back pain."[132]

The plaintiff could not clean her house; her sister did that for her.[133] She could do "a little bit"

---

[120] *Id.*

[121] AR 40.

[122] *Id.*

[123] *Id.*

[124] AR 40–41.

[125] AR 41.

[126] AR 41–42.

[127] AR 42.

[128] *Id.*

[129] *Id.*

[130] *Id.*

[131] AR 43.

[132] *Id.*

[133] *Id.*

of laundry if "there [was] no bending."[134] She prepared simple meals.[135] She could not bend, so to put on shoes she had "somebody pull on the shoelaces and just insert [her] foot in there loosely."[136] She drove only short distances because sitting in the car was painful and she "put a water bottle . . . along her spine" to support her back.[137]

The plaintiff's pain medication and muscle relaxers made her drowsy.[138] She had to take the medications "first thing in the morning after breakfast" or else she could not function.[139] If she got drowsy she took a nap.[140] Her pain affected her "focus and concentration."[141] In response to the attorney's questions about the treatments the plaintiff had tried for her lower back, she listed epidural, facet injections, acupuncture, chiropractic treatment, water therapy, massages and exercise, and physical therapy.[142] She exercised to strengthen her muscles.[143] The injections were helpful "for a brief period, [] like four to six days."[144] Her pain came back and so the surgeons decided not to do more injections.[145] The plaintiff's doctors advised that there was a possibility of surgery at some point.[146] She was "kind of [] reluctant to go to surgery because of the potential complications."[147]

The ALJ then asked the plaintiff when she had her last epidural injection and she responded,

---

[134] AR 44.

[135] *Id.*

[136] AR 45.

[137] AR 45–46.

[138] AR 46.

[139] *Id.*

[140] *Id.*

[141] AR 47.

[142] *Id.*

[143] *Id.*

[144] *Id.*

[145] AR 48.

[146] *Id.*

[147] *Id.*

not "for a couple of years."[148] The ALJ asked whether the plaintiff had an MRI of her back, and she said she had one in 2013.[149]

In addition to her in-person testimony at the hearing, the plaintiff submitted a work history report.[150] From 1998 to 2008, the plaintiff worked as a nurse, and from 2009 to 2014 she worked in home health.[151] Her home-health work "included driving to visit patients in their homes," which "required sitting, bending, squatting" and "prolonged sitting."[152] Her work as a nurse "included a lot of walking, standing, sitting" and "lifting and transferring patients from gurney to bed."[153]

The plaintiff filed an exertion questionnaire to support her claims for benefits.[154] She said that she lived alone in her apartment and had "moderate to severe back pain" that prevented her "from standing, sitting, and walking for longer than 30 minutes."[155] She dusted her furniture, vacuumed her carpet, cooked meals, bathed, and shopped for groceries.[156] She could walk one block and it took her at least 30 to 45 minutes.[157] In addition to taking Tramadol and Tylenol for pain, the plaintiff used "thermawraps before going to bed" and a brace on her lower back when dusting and vacuuming.[158]

### 3.3    Vocational Expert's Testimony

The VE testified at the November 21, 2016 hearing.[159] The ALJ asked the VE to characterize

---

[148] AR 48–49.

[149] AR 49.

[150] AR 173.

[151] Id.

[152] AR 174.

[153] AR 175.

[154] AR 178.

[155] Id.

[156] Id.

[157] Id.

[158] AR 179.

[159] AR 35–59.

the plaintiff's prior work according to the Dictionary of Occupational Titles.[160] She stated that the plaintiff worked as a general duty-nurse (medium, SVP of 7).[161] The ALJ asked whether, if he assessed an RFC of sedentary or light work, the plaintiff could do her prior work as a general nurse, and the VE answered that she could not.[162] The ALJ asked if the plaintiff had "skills from this job transferrable within the same field, the medical field, like the kind of work she was doing before, but at the light level."[163] The VE said that she had "nursing skills" that could transfer to occupational health nursing (light, SVP of 7) with approximately 2,980,000 jobs nationally, school nursing (light, SVP of 7) with 178,000 jobs nationally, and office nursing (light, SVP of 7) with approximately 231,000 jobs nationally.[164]

The plaintiff's attorney examined the VE.[165] The attorney asked whether the plaintiff had transferrable skills to "sedentary jobs within the same field."[166] The VE said that the transferable skills were the same but "the DOT is so old that the jobs [she] would think about for sedentary are not in the DOT so [she] never offer[ed] them."[167] Specifically, the VE mentioned advice nurses who "pretty much [were] just on the phone" but said there was no corresponding DOT code for that position."[168]

The attorney posed the following hypothetical:

---

[160] AR 50. The Dictionary of Occupational Titles (DOT) was created by the Employment and Training Administration for the Office of Administrative Law Judges.

[161] AR 50–51. Specific Vocational Preparation ("SVP") is defined "as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." On the SVP scale, a 7 refers to "skilled work." *Cherwink v. Comm'r of Social Security*, No. 17-cv-00082-JSC, 2018 WL 1050194, at *4 (N.D. Cal. Feb. 26, 2018).

[162] AR 50–51.

[163] AR 51.

[164] AR 51–52.

[165] AR 53.

[166] *Id.*

[167] *Id.*

[168] *Id.*

> [S]o let's say a person [is] limited to light exertional level. Additionally, this person could only perform occasional bending, stooping or crouching. This person would also need the ability to sit, stand[,] and walk at will. Again, the sitting, standing[,] and walking at will when changing positions would mean that the person would need a few minutes, I would say about five minutes to, essentially, stretch in between positions or walk away. So, during this time, they would not be performing any work. Would there be work for a person like that to do?[169]

The VE responded, "I'm going to say no. At that at will, you know, there are certain things, if you're working, you have to be doing at a particular time. And, yes, there's a lot of room to change positions, but not the way you're describing it."[170]

The ALJ asked the VE whether the "occasional bending" limitation would preclude the plaintiff from doing the jobs the VE identified, and the VE said it would not.[171]

The attorney posed a second hypothetical:

> [T]his person may stand and walk for at least two hours in the morning and two hours in the afternoon . . . They sit for one hour at a time and stand for 30 minutes at a time. And, this person would need to change . . . positions a lot for discomfort every 30 minutes . . . [and] lift[] ten pounds frequently, 20 pounds occasionally. And, then again adding the occasional bending, stooping and crouching.[172]

The VE was not able to address that hypothetical because it was unclear.[173] The attorney posed a third hypothetical:

> [T]he person's attention and concentration needed to perform even simple task[s], . . . is affected . . . 16–20% of an eight-hour day or 40-hour work week. Would there be work for a person like that to do? So, essentially, they're off-task during that period of time."[174]

The VE said such a person "wouldn't be able to maintain employment."[175]

---

[169] AR 53–54.

[170] AR 54.

[171] Id.

[172] AR 55–56.

[173] AR 56.

[174] AR 57–58.

[175] AR 58.

### 3.4 Administrative Findings

The ALJ issued an unfavorable decision on January 18, 2017.[176] The ALJ followed the five-step sequential evaluation process to determine whether the plaintiff was disabled and concluded that she was not. 20 CFR 404.1520(a).[177]

At step one, the ALJ found that the plaintiff had not engaged in substantial gainful activity since April 2, 2014, the alleged onset date.[178] The ALJ noted that the earnings record was not available, so he was unable to determine whether the plaintiff's part-time work as a traveling nurse through March 2016 constituted substantial gainful activity.[179] As a result, the ALJ adjudicated the case from the date of the plaintiff's alleged onset date, April 2, 2014.[180]

At step two, the ALJ found that the plaintiff had the following severe impairments: "lumbar disc [dis]placement without myelopathy, lumbago, and backache not otherwise specified."[181] The ALJ found that the plaintiff's "medically determinable mental impairment of adjustment disorder with depressed mood does not cause more than minimal limitation in [her] ability to perform basic mental activities and is therefore non-severe."[182]

Regarding the plaintiff's mental impairment, the ALJ "considered the four broad functional areas set in the disability regulations for evaluating mental disorders and in section 12.00C of the Listing of Impairments (20 CFR Part 404, Subpart P, Appendix 1). These four broad functional areas are known as the paragraph B criteria."[183]

---

[176] AR 15.

[177] AR 18.

[178] AR 20.

[179] *Id.*

[180] *Id.*

[181] *Id.*

[182] AR 21.

[183] *Id.* To meet the paragraph B criteria for listing 12.04, a claimant must demonstrate an "[e]xtreme limitation of one, or marked limitation of two, of the following areas of mental functioning: (1) Understand, remember, or apply information; (2) Interact with others; (3) Concentrate, persist, or maintain pace; (4) Adapt or manage oneself." 20 C.F.R. pt. 5, subpt. P, app'x 1.

The ALJ noted the "claimant ha[d] no limitation" in the first functional area (activities of daily living).[184] The plaintiff was "capable of driving, bathing and dressing herself independently, doing light cleaning, shopping, and preparing simple meals."[185]

Next, the ALJ considered the area of social functioning.[186] The ALJ found the claimant had "no limitation[s]" because "she was able to work as a traveling nurse on a part-time basis."[187]

The third functional area was concentration, persistence, or pace, and the claimant had no limitations there either.[188] The ALJ found that Dr. Marinos's examination of the plaintiff indicated that her impairments were due to her physical (and not her mental) condition.[189]

The fourth functional area was "episodes of decompensation."[190] The ALJ noted that the plaintiff "experienced no episodes of decompensation, which have been of extended duration . . . [and] the claimant has never received any mental health treatment."[191]

The ALJ found that the "claimant's medically determinable mental impairment causes no more than 'mild' limitation" and "is non-severe (20 CFR 404.1520a(d)(1))."[192]

At step three, the ALJ found that the plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.[193] He found that the plaintiff's back condition did not meet listing 1.04 because the record did not demonstrate compromise of a nerve root or the spinal

---

[184] AR 21.

[185] *Id.*

[186] AR 21.

[187] *Id.*

[188] *Id.*

[189] *Id.*

[190] *Id.*

[191] *Id.*

[192] *Id.*

[193] AR 22.

cord.[194] The medical records lacked objective findings of evidence of nerve-root compression characterized by neuro-anatomic distribution of pain, spinal arachnoiditis, or lumbar-spinal stenosis resulting in pseudoclaudication.[195] An MRI revealed that the plaintiff had mild stenosis at L5-S1 and borderline stenosis at L4-5, but that test was conducted on December 17, 2013, before the alleged onset date.[196]

At step four, the ALJ found that the plaintiff had the residual-functional capacity to perform a full range of medium work.[197] In considering the plaintiff's symptoms, the ALJ followed a two-step process in determining a medical impairment and evaluating the intensity, persistence, and limiting effects of the symptoms.[198] The ALJ found that the plaintiff's "medically determinable impairments could reasonably be expected to produce the above alleged symptoms," but the intensity, persistence and limiting effects of these symptoms were not consistent with the medical evidence in the record.[199] The ALJ noted that the plaintiff's normal level of daily activity was the same as that necessary for obtaining and maintaining full-time employment.[200] Additionally, the plaintiff's treatment was conservative in nature with no recommendation for surgical intervention.[201]

Dr. Warbritton's examination of the plaintiff revealed that she had sustained a back injury in

---

[194] *Id.* To meet the criteria for listing 1.04, a claimant must demonstrate a "disorder[] of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord." 20 C.F.R. pt. 5, subpt. P, app'x 1. Listing 1.04 requires a disorder of the spine (for example . . . [4] if there is involvement of the lower back, positive straight–leg raising test (sitting and supine). *Holguin v. Berryhill*, No. 16–cv–06479–HRL, 2017 WL 3033672 at *4 (quoting 20 C.F.R. Part 404, Subpart P, Appendix 1).

[195] AR 22.

[196] *Id.*

[197] *Id.*

[198] AR 23.

[199] AR 24.

[200] *Id.*

[201] *Id.*

April 2001, but she was still able to perform work with appropriate modified job duties.[202] Within a few days after the alleged onset date, the record indicated that the plaintiff was working eight to ten hours a week as a home-health nurse.[203] The ALJ gave little weight to the opinion of PA Kumar because the plaintiff was able to perform work at more than a sedentary level.[204] The ALJ also accorded little weight to Dr. Kaisler-Meza's opinion as supervising physician because the record indicated that PA Kumar was the primary person conducting the examinations.[205]

The ALJ noted that the plaintiff's primary treating physician, Amarjit Singh Mangat, M.D., returned the claimant to full work duty with no limitations or restrictions.[206] The ALJ did not give significant weight to this opinion because the record indicated that the plaintiff's condition limited her to medium-level work.[207]

The ALJ accorded great weight to the opinion of consultative examiner Dr. Marinos.[208] Dr. Marinos noted that the plaintiff's primary functional limitation was related to her physical condition and not her mental condition.[209] Dr. Marinos also noted that the plaintiff was able "to understand, remember, and carry out simple instructions" in a work setting.[210]

At step five, the ALJ found that the plaintiff had the residual-functional capacity to perform a full range of light work beginning February 26, 2016, as noted by Dr. Salamacha.[211] Dr. Salamacha's physical examination revealed that the plaintiff was in no acute distress, had a normal reciprocal gait, her Romberg — or posture — test was negative, she used no assistive device, and

---

[202] *Id.*

[203] AR 25.

[204] *Id.*

[205] *Id.*

[206] *Id.* A review of the Administrative Record revealed that Dr. Mangat's opinion, located at AR 875, refers to a patient named "Carolyn Bynum" and not the plaintiff. The ALJ accorded little weight to this opinion because it was inconsistent with the medical record. *See* Mot. – ECF No. 18 at 15.

[207] AR 25.

[208] *Id.*

[209] AR 25–26.

[210] AR 25.

[211] AR 26.

her straight-leg test was negative.[212] The ALJ noted Dr. Salamacha's determination that the plaintiff was capable of light work and could sit for six hours, stand for four hours, and walk for two hours.[213] The ALJ concluded that the plaintiff's alleged functional limitations were inconsistent with the medical evidence of record and that she was able to perform her past relevant work as a general nurse.[214]

The ALJ found that the plaintiff was not disabled.[215]

## STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), district courts have jurisdiction to review any final decision of the Commissioner if the claimant initiates a suit within sixty days of the decision. A court may set aside the Commissioner's denial of benefits only if the ALJ's "findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (internal citation and quotation marks omitted); 42 U.S.C. § 405(g). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews v. Shalala,* 53 F.3d 1035, 1039 (9th Cir. 1995). The reviewing court should uphold "such inferences and conclusions as the [Commissioner] may reasonably draw from the evidence." *Mark v. Celebrezze*, 348 F.2d 289, 293 (9th Cir. 1965). If the evidence in the administrative record supports the ALJ's decision and a different outcome, the court must defer to the ALJ's decision and may not substitute its own decision. *Tackett v. Apfel*, 180 F.3d 1094, 1097–98 (9th Cir. 1999). "Finally, [a court] may not reverse an ALJ's decision on account of an error that is harmless." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012).

---

[212] *Id.*
[213] AR 27.
[214] AR 26–27.
[215] AR 29.

# APPLICABLE LAW

A claimant is considered disabled if (1) he suffers from a "medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months," and (2) the "impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exits in the national economy. . . ." 42 U.S.C. § 1382c(a)(3)(A) & (B). The five-step analysis for determining whether a claimant is disabled within the meaning of the Social Security Act is as follows. *Tackett*, 180 F.3d at 1098 (citing at 20 C.F.R. § 404.1520).

**Step One.** Is the claimant presently working in a substantially gainful activity? If so, then the claimant is "not disabled" and is not entitled to benefits. If the claimant is not working in a substantially gainful activity, then the claimant's case cannot be resolved at step one, and the evaluation proceeds to step two. *See* 20 C.F.R. § 404.1520(a)(4)(i).

**Step Two.** Is the claimant's impairment (or combination of impairments) severe? If not, the claimant is not disabled. If so, the evaluation proceeds to step three. *See* 20 C.F.R. § 404.1520(a)(4)(ii).

**Step Three.** Does the impairment "meet or equal" one of a list of specified impairments described in the regulations? If so, the claimant is disabled and is entitled to benefits. If the claimant's impairment does not meet or equal one of the impairments listed in the regulations, then the case cannot be resolved at step three, and the evaluation proceeds to step four. *See* 20 C.F.R. § 404.1520(a)(4)(iii).

**Step Four.** Considering the claimant's RFC, is the claimant able to do any work that he or she has done in the past? If so, then the claimant is not disabled and is not entitled to benefits. If the claimant cannot do any work he or she did in the past, then the case cannot be resolved at step four, and the case proceeds to the fifth and final step. *See* 20 C.F.R. § 404.1520(a)(4)(iv).

**Step Five.** Considering the claimant's RFC, age, education, and work experience, is the claimant able to "make an adjustment to other work?" If not, then the claimant is disabled and entitled to benefits. *See* 20 C.F.R. § 404.1520(a)(4)(v). If the claimant is able to do other work, the Commissioner must establish that there are a significant number of jobs in the national economy that the claimant can do. There are two ways for the Commissioner to show other jobs in significant numbers in the national economy: (1) by the testimony of a vocational expert or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R., part 404, subpart P, app. 2.

For steps one through four, the burden of proof is on the claimant. *Gonzales v. Sec'y of Health & Human Servs.*, 784 F.2d 1417, 1419 (9th Cir. 1986). At step five, the burden shifts to the Commissioner. *Id.*

## ANALYSIS

The plaintiff contends the ALJ erred by (1) failing to provide specific and legitimate reasons for rejecting the opinion of her treating and examining doctors, (2) failing to properly consider the plaintiff's own testimony, and (3) failing to support the step-four and step-five findings with substantial evidence.[216]

The court holds that the ALJ erred by discounting the opinions of Dr. Kaisler-Meza and PA Kumar and by discounting the plaintiff's testimony. Because the ALJ's analysis was predicated on his findings, the court also finds that the step-four and step-five analyses were not supported by substantial evidence.

### 1. Whether the ALJ Properly Weighed Medical Evidence

The plaintiff contends that the ALJ failed to properly weigh the opinions of her treating physician, Dr. Kaisler-Meza.[217]

The ALJ is responsible for "'resolving conflicts in medical testimony, and for resolving ambiguities.'" *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014) (quoting *Andrews*, 53 F.3d at 1039). In weighing and evaluating the evidence, the ALJ must consider the entire case record, including each medical opinion in the record, together with the rest of the relevant evidence. 20 C.F.R. § 416.927(b); *see also Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) ("[A] reviewing court [also] must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence.") (internal quotation marks and citation omitted).

---

[216] Mot. – ECF No. 18 at 6.

[217] *Id.* at 14–17.

"In conjunction with the relevant regulations, [the Ninth Circuit has] developed standards that guide [the] analysis of an ALJ's weighing of medical evidence."[218] *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (citing 20 C.F.R. § 404.1527). Social Security regulations distinguish between three types of physicians: (1) treating physicians; (2) examining physicians; and (3) non-examining physicians. 20 C.F.R. § 416.927(c), (e); *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). "Generally, a treating physician's opinion carries more weight than an examining physician's, and an examining physician's opinion carries more weight than a reviewing [non-examining] physician's." *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001) (citing *Lester*, 81 F.3d at 830); *Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996).

An ALJ may disregard the opinion of a treating physician, whether or not controverted. *Andrews*, 53 F.3d at 1041. "To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Ryan*, 528 F.3d at 1198 (internal quotation marks and citation omitted). By contrast, if the ALJ finds that the opinion of a treating physician is contradicted, a reviewing court will require only that the ALJ provide "specific and legitimate reasons supported by substantial evidence in the record." *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) (internal quotation marks and citation omitted); *see also Garrison*, 759 F.3d at 1012 ("If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence.") (internal quotation marks and citation omitted). The opinions of non-treating or non-examining physicians may serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record. *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002). An ALJ errs, however, when he "rejects a medical opinion or assigns it little weight" without explanation or without explaining why "another medical opinion is more persuasive, or criticiz[es]

---

[218] The Social Security Administration promulgated new regulations, including a new § 404.1521, effective March 27, 2017. The previous version, effective to March 26, 2017, governs here based on the date of the ALJ's hearing, November 21, 2016.

it with boilerplate language that fails to offer a substantive basis for his conclusion." *Garrison*, 759 F.3d at 1012-13.

"If a treating physician's opinion is not given 'controlling weight' because it is not 'well-supported' or because it is inconsistent with other substantial evidence in the record, the [Social Security] Administration considers specified factors in determining the weight it will be given." *Orn*, 495 F.3d at 631. "Those factors include the '[l]ength of the treatment relationship and the frequency of examination' by the treating physician; and the 'nature and extent of the treatment relationship' between the patient and the treating physician." *Id.* (quoting 20 C.F.R. § 404.1527(d)(2)(i)-(ii)) (alteration in original). "Additional factors relevant to evaluating any medical opinion, not limited to the opinion of the treating physician, include the amount of relevant evidence that supports the opinion and the quality of the explanation provided[,] the consistency of the medical opinion with the record as a whole[, and] the specialty of the physician providing the opinion . . . ." *Id.* (citing 20 C.F.R. § 404.1527(d)(3)-(6)).

The ALJ found the following about Dr. Kaisler-Meza's opinion:

> Treating physician Allen Kaisler-Meza, M.D. opined that the claimant is limited to a less than sedentary functional[it]y with sitting a total of 2 hours, standing a total of 2 hours and walking less than an hour (Exhibit 13F at 2, 3). The undersigned gives little weight to Dr. Kaisler-Meza's opinion because although he has treated the claimant since November 16, 2006, the record indicates that physician assistant Kumar was the primary person conducting the examinations with Dr. Kaisler-Meza being the supervising physician (Exhibit 16F at 29). Furthermore, Dr. Kaisler-Meza's opinion in the medical source statement is not consistent with the objective evidence of record.[219]

Dr. Kaisler-Meza's opinion is contradicted by the opinions of the consultative examiners.[220] Thus, the ALJ was required to give specific and legitimate reasons supported by the record for discounting the opinion. *Reddick*, 157 F.3d at 725. The court holds that the ALJ did not meet this standard.

The ALJ gave little weight to Dr. Kaisler-Meza's opinion because PA Kumar was the

---

[219] AR 25.

[220] *Compare* AR 471 *and* 592 *with* AR 598 *and* AR 888.

"primary person" examining the plaintiff.[221] This is not a specific and legitimate reason to discount the opinion. Under CFR § 404.1502, a supervising physician is not precluded from being considered a treating physician. "[T]he use of a team approach by medical providers is analytically significant" if the opinions among the various treating doctors are consistent, as they were between Dr. Kaisler-Meza and PA Kumar. *Benton ex rel. Benton v. Barnhart*, 331 F.3d 1030, 1037 (9th Cir. 2003). A supervising physician may employ a nurse to physically conduct the medical examinations without fear of losing the treating physician status; doing so may place the physician "relatively low on the continuum of treating physicians," but they "would still fall into the treating physician category" and their "opinion would be entitled to greater weight than that of an examining or reviewing physician." *Benton ex rel. Benton v. Barnhart*, 331 F.3d at 1039.

Here, Dr. Kaisler-Meza and PA Kumar adopted a team approach. Based on the array of different treatment strategies that were prescribed and acknowledged in Dr. Kaisler-Meza's medical source statement, both PA Kumar and Dr. Kaisler-Meza were familiar with the plaintiff's case. Dr. Kaisler-Meza was kept informed of her condition and retained responsibility for her care over the course of several years. Dr. Kaisler-Meza's assessment of the plaintiff's condition was predicated not only on his own observations but also on the plaintiff's records reflecting assessments and treatments by PA Kumar. His signature on 54 progress reports shows that he was aware of the ongoing treatment and medication management of the plaintiff's back issues, and his assessment cannot be divorced from the plaintiff's overall treatment at a treatment facility.

The ALJ also discredited Dr. Kaisler-Meza's opinion because it was not consistent with the objective evidence of the record as a whole.[222] A review of the record reveals that this is not the case. The plaintiff was consistently diagnosed with and treated for various back-related injuries.[223]

---

[221] AR 25.

[222] *Id.*

[223] AR 471, 475, 479, 487, 492, 497 (diagnoses of lumbar–disc displacement without myelopathy and lumbago); AR 890 (diagnosis of right L5 radiculitis with pain distribution); AR 246 (impressions including moderate to chronic lumbar strains, degenerative disc disease, and possible right lumbosacral radiculopathy); AR 599 (acknowledging in a Psychological Screen Evaluation that "the major obstacle to adequate job performance would appear to be the claimant's physical condition.").

The ALJ found that the plaintiff's work history and income records supported work as a general nurse, but the plaintiff's medical history contains significant and long-lasting diagnoses of lumbar-disc displacement without myelopathy and restrictions placed on her ability to move and lift.[224] The record shows that the plaintiff suffered an injury to her back and over the course of several years tried multiple interventions (including medication, aquatic therapy, and epidural injections) without significant success or relief of symptoms. The ALJ did not identify specific objective evidence in the record that was inconsistent with the plaintiff's treating doctor's opinion. The court remands for reconsideration of the medical-opinion evidence.

## 2.  Whether the ALJ Erred by Discounting the Plaintiff's Testimony

In assessing a claimant's credibility, an ALJ must make two determinations. *Molina*, 674 F.3d at 1112. "First, the ALJ must determine whether [the claimant has presented] 'objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged.'" *Id.* (quoting *Vasquez*, 572 F.3d at 591). Second, if the claimant produces that evidence, and "there is no evidence of malingering," the ALJ must provide "specific, clear and convincing reasons for" rejecting the claimant's testimony regarding the severity of the claimant's symptoms. *Id.* (internal quotation marks and citations omitted).

"Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment." *Orn*, 495 F.3d at 636 (internal punctuation omitted). "[T]he ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014); *see, e.g.*, *Morris v. Colvin*, No. 16-CV-0674-JSC, 2016 WL 7369300, at *12 (N.D. Cal. Dec. 20, 2016).

In order to have meaningful appellate review, the ALJ must explain its reasoning and "*specifically identify* the testimony [from a claimant] she or he finds not to be credible and . . .

---

[224] AR 26, 471, 475, 479, 487, 492, 497.

explain what evidence undermines the testimony." *Treichler v. Comm'r of Soc. Sec.*, 775 F.3d 1090, 1102–03 (9th Cir. 2014) ("Credibility findings must have support in the record, and hackneyed language seen universally in ALJ decisions adds nothing.") (emphasis in original, internal quotations omitted). "That means '[g]eneral findings are insufficient.'" *Id.* at 1102 (quoting *Lester*, 81 F.3d at 834); *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002) ("the ALJ must make a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony" (citing *Bunnell v. Sullivan*, 947 F.2d 341, 345–46 (9th Cir. 1991) (en banc)). Moreover, the court will "review only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely." *Garrison*, 759 F.3d at 1010. Here, the ALJ found the following about the plaintiff's testimony:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the [] alleged symptoms; however, the claimant's statements concerning the intensity, persistence[,] and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision. Accordingly, these statements have been found to affect the claimant's ability to work only to the extent they can reasonably be accepted as consistent with the objective medical and other evidence. In reaching this conclusion, the undersigned considered the claimant's activities of daily living, treatment and medication, and objective evidence.[225]

The ALJ did not identify specifically what portions of the plaintiff's testimony were not credible or specifically identify what medical evidence and other evidence in the record undermined his testimony. This was not a specific, clear, and convincing basis for rejecting his testimony. *Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014). The court remands for reconsideration of this issue too.

---

[225] AR 24.

### 3. The ALJ's Findings at Steps Four and Five

The plaintiff argues that the ALJ's findings at steps four and five were not supported by substantial evidence. [226] The ALJ found that the plaintiff was "capable of performing [her] past relevant work as a general nurse" and that the plaintiff "ha[d] the residual functional capacity to perform the full range of medium work as defined in 20 CFR 404.1567(b)."[227] Because the court remands for a reweighing of medical-opinion evidence and the plaintiff's testimony, and because the past-relevant-work and RFC determinations are based on those assessments, the court remands on this ground.

### CONCLUSION

The court grants the plaintiff's motion for summary judgment, denies the Commissioner's cross-motion for summary judgment, and remands the case for further proceedings consistent with this order.

This disposes of ECF 18 at 19.

**IT IS SO ORDERED.**

Dated: June 14, 2019

_____
LAUREL BEELER
United States Magistrate Judge

---

[226] Mot. – ECF No. 18 at 6.
[227] AR 26.